**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RENE LOPEZ RODRIGUEZ,

　　　　　　　　　*Petitioner,*

　　　　v.

ERIC H. HOLDER, Jr., Attorney
General,

　　　　　　　　　*Respondent.*

No. 08-71481

Agency No.
A079-658-197

RENE LOPEZ RODRIGUEZ,

　　　　　　　　　*Petitioner,*

　　　　v.

ERIC H. HOLDER, Jr., Attorney
General,

　　　　　　　　　*Respondent.*

No. 08-73353

Agency No.
A079-658-197

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 17, 2012—San Francisco, California

Filed June 27, 2012

Before: Procter Hug, Jr., Betty B. Fletcher, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Daniel M. Kowalski, The Fowler Law Firm, PC, Austin, Texas, for petitioner Rene Lopez-Rodriguez.

Tracey N. McDonald (argued), Gregory G. Katsas, Assistant Attorney General, Blair T. O'Connor, Assistant Director, Edward C. Durant, United States Department of Justice, Washington, D.C., for respondent Eric H. Holder, Jr., Attorney General.

## OPINION

PAEZ, Circuit Judge:

The Board of Immigration Appeals' (BIA or Board) governing regulations limit its scope of review of an immigration judge's (IJ) factual findings. Under 8 C.F.R. § 1003.1(d)(3)(i), (iv), the BIA may only review findings of fact for clear error, and is prohibited from making its own factual determinations. In this petition for review, which arises in the context of allegations of drug smuggling, we consider whether the Board exceeded these limitations when it reversed the IJ's determination that petitioner Rene Lopez-Rodriguez was admissible and concluded instead that Lopez-Rodriguez was inadmissible under 8 U.S.C. § 1182(a)(2)(C). Because we conclude that the Board committed legal error by making its own factual determination and engaging in de novo review of the IJ's factual findings, we grant the petition and remand for further proceedings.

### I.

Rene Lopez-Rodriguez is a native and citizen of Mexico. In 2006, he was working as a "runner" or supplier for ships in Puerto Peñasco, Sonora, a fishing and resort town located

on the Gulf of California.[1] He had been working for the same employer for two years. His employer would regularly send him to a particular store in Phoenix, Arizona to pick up various parts for ships. According to Lopez-Rodriguez's testimony, he had been using his employer's 2000 Dodge Ram 1500 series pickup truck to make these trips for approximately three months prior to the incident at issue in this case.

On July 22, 2006, Lopez-Rodriguez picked up the Dodge truck from his employer in the morning, and drove to the border crossing at Lukeville, Arizona. His destination was Phoenix, where he planned to exchange old ship motor pistons for new ones and to have the tires on the truck replaced. The truck's gas gauge indicated that the gas tank was full when Lopez-Rodriguez picked up the truck. Lopez-Rodriguez testified that he did not refill the tank during the approximately 60-mile drive from Puerto Peñasco to the Lukeville port of entry.

Upon arrival at the port of entry, Lopez-Rodriguez and his truck were inspected by Customs and Border Protection (CBP) officers Sergio Ballesteros, Jr. and Ivan Gonzalez. Lopez-Rodriguez told the officers that he was going to Phoenix to pick up pistons, that the truck belonged to his boss, and that he had nothing to declare for customs. The officers then inspected the truck by tapping the gas tank with a brass rod and found that the tank "tapped abnormally hard," which is often a signal that something solid is inside the tank. After being questioned a second time, Lopez-Rodriguez again stated that he had no items to declare. At that point, the officers escorted Lopez-Rodriguez from his truck to a nearby office, where he was detained while Officer Gonzalez conducted a secondary inspection of the truck. According to the

---

[1]This factual summary is drawn from testimony by Lopez-Rodriguez and two Customs and Border Protection officers at his inadmissibility hearings, and from factual findings made by the IJ.

officers, Lopez-Rodriguez was "calm" during this entire period.

Officer Gonzalez drove the Dodge truck from the primary inspection lanes to the secondary inspection area. He testified that the gas gauge needle indicated that the tank was full. After using a fiber optic scope to determine that there were packages inside the gas tank, Officer Gonzalez put Lopez-Rodriguez into a detention cell. At that point, Lopez-Rodriguez asked why he was being detained and Officer Gonzalez told him that he had found drugs inside the truck. Lopez-Rodriguez testified that he was not aware of the presence of drugs in the truck until that moment, and that he "couldn't believe it." He remained calm and was silent upon hearing this news, because he "didn't know what to say" and "couldn't think of anything."

Officer Gonzalez then removed the gas tank from the truck and removed the sending unit from the tank to gain access to the tank's interior, where he found 46 vacuum-sealed packages of marijuana. They weighed, in total, approximately 46 kilograms or 101 pounds. According to Officer Gonzalez, the gas tank was "very full" of gas and "fuel was spilling out" when he removed the sending unit.

At Lopez-Rodriguez's merits hearing, Officer Gonzalez testified that, based upon his experience, the truck's gas tank had a capacity of approximately 30 gallons. He also testified that he estimated that the marijuana took up "[p]robably 25 gallons, leaving about 5 gallons of fluid that can be inside the gas tank with—along with the contraband." Officer Gonzalez opined that "[i]f the gas tank was reading properly and if it was full, by the time he got from [Puerto Peñasco] to [Lukeville], [the gas gauge] would have read empty," and Lopez-Rodriguez "would have had to refuel again."

Upon further questioning by the IJ, Officer Gonzalez clarified that his statement that there was room for five gallons of

fuel in the gas tank was "a rough estimate" and that there might have been room for between four and six gallons. He stated that he based the estimate on "how much I have to syphon out, [and] how long it takes me." The amount of fuel in the truck's gas tank was never actually measured. When the IJ asked Lopez-Rodriguez to respond to Officer Gonzalez's conclusions, Lopez-Rodriguez said, "But, it is the truth. I didn't fill up with gas."

## II.

Lopez-Rodriguez was paroled into the United States to face immigration and criminal charges following his initial detention at the Lukeville port of entry. However, no criminal charges were ever filed against Lopez-Rodriguez in connection with this incident. Subsequently, he was charged with being ineligible for admission because there was "reason to believe" that he was or had been an illicit trafficker of a controlled substance, or because he was or had been "a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking [of a] controlled substance" in violation of INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C).

Lopez-Rodriguez proceeded pro se in his hearings before the IJ.[2] At his second master calendar hearing, Lopez-

---

[2]Lopez-Rodriguez appeared a total of three times before the IJ. His first master calendar hearing was a group advisement of rights on August 17, 2006. The IJ continued Lopez-Rodriguez's case after Lopez-Rodriguez stated that he wanted to seek counsel, although he also said that if his case were to be postponed then he would waive his right to counsel. His next appearance before the IJ was at a second master calendar hearing on August 24, 2006, at which Lopez-Rodriguez testified that he did not know that there was marijuana in the truck's gas tank until CBP officers told him as much at the Lukeville port of entry. The IJ continued the case to allow the government to call other witnesses and to ask Lopez-Rodriguez more extensive questions. Lopez-Rodriguez's final appearance before the IJ occurred at his removal hearing on September 14, 2006. At the removal hearing, the IJ heard further testimony from Lopez-Rodriguez and testimony from CBP officers Ballesteros and Gonzalez.

Rodriguez admitted the charges against him, but at his removal hearing he explained that he had done so in order "to go faster to Mexico" where his children were in school and needed his salary to pay their educational expenses. At all of his appearances before the IJ, Lopez-Rodriguez expressed a desire to have a hearing immediately so that he could return to Mexico as quickly as possible.

Three witnesses—Lopez-Rodriguez, Officer Ballesteros, and Officer Gonzalez—testified at the removal hearing, and the IJ found all three to be credible. In fact, the IJ ended his oral decision by noting that Lopez-Rodriguez "has maintained steadfastly that he had no knowledge that there was marijuana in the vehicle at any time," and then stated, "I believe him."

The IJ summarized the case by explaining that it "all comes down to whether [Lopez-Rodriguez] is stating falsely that he refueled between Puerto Peñasco and the Port of Entry at Lukeville, Arizona." Concluding that "it may very well be true that the applicant did not put gas in the vehicle prior to getting to the Port of Inspection in Lukeville," and that Lopez-Rodriguez "was used by his employer or by somebody unbeknownst to his employer" to transport the marijuana, the IJ found that there was no "reason to believe" that Lopez-Rodriguez "is an elicit [sic] trafficker in a controlled substance or knowingly aided, abetted, colluded, et cetera." Lopez-Rodriguez was admitted into the United States as a visitor until September 18, 2006, four days after the date of the hearing and decision. Lopez-Rodriguez remained detained during the appeals process, however, and was removed to Mexico at some point following the BIA's first decision reversing the IJ.

The government appealed the IJ's ruling to the BIA, challenging the IJ's finding that there was "no reason to believe" that Lopez-Rodriguez had trafficked in a controlled substance. The BIA reversed the IJ twice. In its first decision, dated February 17, 2007, the BIA reversed the IJ because Lopez-

Rodriguez's "credibility is undermined by the fact that such a large amount of marijuana—over 100 pounds—was found concealed in the truck and his implausible story that he traveled from Puerto Peñasco to the Arizona border on only 5 gallons of gas and arrived at the port of entry with a full tank." Lopez-Rodriguez petitioned for review of that decision with this court. Subsequently, the government filed a motion to remand the case to the BIA, explaining that "notwithstanding its reference to the 'clear error' standard, the Board may have engaged in *de novo* review of the [IJ]'s fact-findings, something that 8 C.F.R. § 1003.1(d)(3)(i) prohibits." We granted the motion and remanded the case to the BIA.

On remand, the BIA again reversed the IJ in a decision dated March 17, 2008. In its order, the BIA specifically stated that it had been directed to re-evaluate its earlier decision under the clear error standard, and further wrote that it was "mindful that [it is] not to engage in *de novo* review of facts determined by the [IJ]." Noting that the IJ had found Officer Gonzalez credible and that Officer Gonzalez had "significant experience inspecting cars at the border," and asserting that Lopez-Rodriguez had contradicted himself in his testimony, the BIA, "upon consideration of the evidence and testimony of record," concluded that it was "left with the definite and firm conviction" that the IJ's decision to admit him was "clearly erroneous." In particular, the Board "f[ou]nd it impossible to accept the [IJ]'s conclusion that the applicant testified credibly."

The BIA explained its decision by discussing in detail Officer Gonzalez's testimony, in particular the estimates that Officer Gonzalez provided of the space available in the gas tank and the amount of gas removed from the tank during his inspection of the truck. The BIA also noted that Officer Gonzalez had "concluded that [Lopez-Rodriguez] could not have driven the distance from Puerto Peñasco to the border without refueling and still have 4 to 6 gallons of gas filling up the tank."

As to Lopez-Rodriguez's credibility, the BIA concluded that the IJ ignored a contradiction in his testimony. According to the BIA, "the applicant first testified that his employer had never asked him to drive the employer's truck into the United States to pick up supplies before. Yet, he later testified that he had driven his employer's truck to the United States very often, as much as every week, in the 3 months before he was arrested at the border."

The BIA also concluded that the IJ erred by finding no "reason to believe" that Lopez-Rodriguez was an illicit trafficker because the standard for inadmissibility under INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C) is "quite low" and is analogous to the probable cause standard.

Lopez-Rodriguez timely petitioned for review, arguing primarily that the BIA violated 8 C.F.R. § 1003.1(d)(3) by engaging in prohibited de novo review, and arguing in passing that the Board improperly equated the regulation's "reason to believe" standard to the probable cause standard. Although we grant the petition, we do not address the latter issue.

## III.

Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our "review 'is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted.' " *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000)).

We have jurisdiction over questions of law pursuant to 8 U.S.C. § 1252(a)(2)(D), and we review de novo the BIA's determinations of questions of law and its legal conclusions. *Tamang v. Holder*, 598 F.3d 1083, 1088 (9th Cir. 2010). Whether the BIA has applied the correct standard of review is a question of law. *Arteaga v. I.N.S.*, 836 F.2d 1227, 1228 (9th Cir. 1988), *abrogated on other grounds by I.N.S. v. Elias-*

*Zacarias*, 502 U.S. 478 (1992); *see also Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006) (holding that the court "can determine whether the BIA applied the correct legal standard in making its determination"), *overruled on other grounds by Estrada-Espinoza v. Mukasey*, 546 F.3d 1147, 1160 n.15 (9th Cir. 2008) (en banc).

[1] BIA regulations prohibit the Board from "engag[ing] in de novo review of findings of fact determined by an [IJ]." 8 C.F.R. § 1003.1(d)(3)(i); *see also Brezilien v. Holder*, 569 F.3d 403, 413 (9th Cir. 2009) (noting that "where the IJ has made a factual finding, the BIA has very limited authority to revisit that finding"). Instead, "[f]acts determined by the [IJ], *including findings as to the credibility of testimony*, shall be reviewed only to determine whether the findings of the [IJ] are clearly erroneous." § 1003.1(d)(3)(i) (emphasis added). Where the BIA engages in de novo review of an IJ's factual findings instead of limiting its review to clear error, it has committed an error of law, as our sister circuits have recognized, and we have no difficulty in agreeing with that conclusion. *See*, *e.g.*, *Turkson v. Holder*, 667 F.3d 523, 528 (4th Cir. 2012) (holding that "the BIA committed error as a matter of law because it failed to apply the appropriate standard of review"); *Chen v. Bureau of Citizenship and Immigration Serv.*, 470 F.3d 509, 515 (2d Cir. 2006) (holding that the BIA's independent credibility assessment amounted to "de novo review and constitutes legal error by the BIA requiring remand"). We do not rely on the Board's invocation of the clear error standard; rather, when the issue is raised, our task is to determine whether the BIA faithfully employed the clear error standard or engaged in improper de novo review of the IJ's factual findings.[3]

---

[3]Several of our sister circuits have remanded cases to the agency where the BIA, although invoking the "clear error" standard of review, actually engaged in prohibited de novo review or fact-finding. *See*, *e.g.*, *Alvarado de Rodriguez v. Holder*, 585 F.3d 227, 235 (5th Cir. 2009) ("Quite simply, the BIA is not entitled to state the correct legal standard but actually apply

**[2]** Where the IJ has not made a finding of fact on a disputed matter, and such a finding is necessary to resolution of the case, the BIA must remand to the IJ to make the required finding; it may not conduct its own fact-finding. 8 C.F.R. § 1003.1(d)(3)(iv); *Brezilien*, 569 F.3d at 413 (concluding that the regulation unambiguously "requires the BIA to remand the factual inquiry to the IJ rather than making its own factual finding on the matter"); *see also Padmore v. Holder*, 609 F.3d 62, 69 (2d Cir. 2010) ("The IJ did not find facts with respect to this incident. If the BIA continues to believe that factfinding on these issues is necessary for an appropriate exercise of discretion, it should remand to the IJ for that purpose."). Where the BIA fails to follow its own regulations and makes factual findings, "it commits an error of law, which we have jurisdiction to correct." *Padmore*, 609 F.3d at 67.

## IV.

### A.

**[3]** The BIA may find an IJ's factual finding to be clearly erroneous if it is "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." *Anderson v. Bessemer City*, 470 U.S. 564, 577 (1985); *see also United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).[4]

---

an incorrect standard."); *Kabba v. Mukasey*, 530 F.3d 1239, 1246 (10th Cir. 2008) ("Although the BIA's opinion set forth the correct standard of review and recited a conclusion that the IJ's credibility findings were clearly erroneous, the BIA did not apply this deferential standard in substance."); *Chen*, 470 F.3d at 515 ("Although the BIA used the phrase 'clearly erroneous' in its opinion, the review it conducted in fact was to independently assess Chen's credibility without giving deference to the findings of the IJ. This is de novo review . . . ."). We apply the same scrutiny here to the BIA's assertions that it reviewed the IJ's decision for clear error.

[4]We relied heavily on *Anderson* in our discussion of abuse of discretion in *Hinkson*, quoting directly from the opinion in our formulation of this

**[4]** The Supreme Court's opinion in *Anderson* is extremely helpful to our understanding of the limits on the BIA when it reviews the IJ's factual findings for clear error. In fact, the Department of Justice cited *Anderson* in the explanatory comments that it issued to accompany the new regulations adopting the clear error standard of review, and concluded that "[a] factfinding may not be overturned simply because the Board would have weighed the evidence differently or decided the facts differently had it been the factfinder." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,889 (Aug. 26, 2002) (citing *Anderson*, 470 U.S. at 573).

*Anderson* provides important guidance on the purpose and limits of the clear error standard:

> Th[e clear error] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court. . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Where*

---

circuit's abuse of discretion test. 585 F.3d at 1262. Although *Hinkson* specifically addressed the abuse of discretion standard, the opinion noted that the Supreme Court "defined abuse of discretion review of factual findings in terms of 'clearly erroneous' review, holding that '[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable . . . .' " *Id.* at 1259 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990)) (alteration in original). We subsequently quoted *Hinkson*'s formulation of the abuse of discretion test as a statement of the standard for clear error review. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 395 (9th Cir. 2011).

*there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*

470 U.S. at 573-74 (emphasis added); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 857-58 (1982) ("An appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court 'might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent.' " (quoting *United States v. Real Estate Boards*, 339 U.S. 485, 495 (1950))).

**[5]** In particular, where credibility determinations are at issue, *Anderson* counsels that "even greater deference" must be afforded to the IJ's factual findings, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575 (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)). Similarly, the Fourth Circuit very recently noted that "IJs hear witnesses and determine the credibility of evidence. The BIA reviews a paper record, devoid of the nuances of weighing evidence first hand. The IJ is thus in a better position to make factual determinations than the BIA acting in an appellate capacity." *Turkson*, 667 F.3d at 527.

Of course, as the *Anderson* Court rightly pointed out, "[t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." 470 U.S. at 575. In certain circumstances, *Anderson* explains, the weight of the record may overcome a positive credibility determination:

Documents or objective evidence may contradict the witness' story; or the story itself may be so internally

inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Id.* (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). However, the *Anderson* court concluded by explaining that

when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, *that finding, if not internally inconsistent, can virtually never be clear error.*

*Id.* (emphasis added).

In the context of this case, it would be error for the BIA to hold that the IJ's findings of fact and credibility determinations were clearly erroneous if those findings and determinations were not illogical or implausible and had support in inferences that may be drawn from the record, and if Lopez-Rodriguez's testimony is uncontradicted by objective evidence and internally consistent.

## B.

The BIA relied on two aspects of the testimony in this case to vacate the IJ's decision and to find that certain factual findings were "clearly erroneous": Officer Gonzalez's estimates and opinions regarding the amount of gas in the gas tank, and a supposed contradiction in Lopez-Rodriguez's testimony. The testimony regarding these issues, according to the BIA, made it "impossible to accept" that Lopez-Rodriguez testified credibly. However, by characterizing Officer Gonzalez's estimates and opinions as factual, the BIA engaged in impermis-

sible fact-finding. In addition, the BIA engaged in further fact-finding and in de novo review of the IJ's factual findings by concluding that Lopez-Rodriguez contradicted himself. Finally, the BIA applied de novo review to the IJ's credibility determination by independently assessing Lopez-Rodriguez's credibility without deference to the IJ's findings.

*Officer Gonzalez's Testimony*

The IJ made certain findings of fact in his oral decision. He found that both the CBP officers and Lopez-Rodriguez testified credibly. He also found that Lopez-Rodriguez worked as a runner for fishing boats, providing supplies as directed by his employer, and that the truck in question belonged to Lopez-Rodriguez's employer. Further, the IJ found that Lopez-Rodriguez was calm throughout his interactions with the CBP officers at the port of entry.

The IJ made no factual findings, however, as to the quantity of gas in the Dodge truck either when Lopez-Rodriguez left Puerto Peñasco or when he arrived at the Lukeville port of entry, or as to the amount of gas that the truck used per mile from Puerto Peñasco to Lukeville on July 22, 2006.[5] Furthermore, the IJ made no factual determination of whether Lopez-Rodriguez refueled during his drive north. Although the IJ did note that both Officer Gonzalez and Lopez-Rodriguez testi-

---

[5]The IJ noted Officer Gonzalez's estimates on these factual questions, but subsequently stated that "there is no statement of expertise in measurement of Officer Gonzalez. And, in questioning by the Court, he acknowledges that there might have been four gallons, maybe five, maybe six. He is not sure of the exact amount. . . . There was no actual measurement of the amount of gas that was in there. This was all by basically, for lack of a better term, eyeballing it." The IJ further concluded that the government's printout of a Dodge Ram 1500 series pickup truck's likely fuel usage from the web site *www.fueleconomy.gov* "does not answer the question of actually how much gas was in the vehicle when the applicant started from Puerto Peñasco versus how much was in the vehicle when it was syphoned out and not put into any measurement."

fied that the gas gauge indicated that the tank was full upon arrival at the Lukeville port of entry, he did not make a specific finding on the issue.

The BIA may not make its own factual findings to resolve these issues; if the BIA believes that it cannot decide the case without resolution of these facts, then it must remand to the IJ for further factual findings. 8 C.F.R. § 1003.1(d)(3)(iv); *Brezilien*, 569 F.3d at 413; *Padmore*, 609 F.3d at 69. Here, however, the BIA accepted as true Officer Gonzalez's estimates and opinions regarding these unresolved factual issues. The BIA also stated conclusively that the truck's gas gauge reflected that the tank was full upon arrival at the Lukeville port of entry.[6] This is fact-finding prohibited by § 1003.1(d)(3)(iv).

In its decision the Board cited "Officer Gonzalez's credible testimony" as one reason why it is "impossible to accept the [IJ]'s conclusion that [Lopez-Rodriguez] testified credibly."

---

[6]There is nothing in the record to establish that the gas gauge accurately reflected the quantity of gas in the tank. Indeed, Officer Gonzalez qualified his testimony regarding the gas gauge by stating that "*If* the gas tank was reading properly and *if* it was full, by the time [Lopez-Rodriguez] got from [Puerto Peñasco] to [Lukeville], it would have read empty." Officer Gonzalez's testimony is also somewhat contradictory on the issue of the gas gauge. The government's attorney initially asked him if the flotation device that measures the quantity of gas in the tank was "unobstructed by these packages [of marijuana]," and Officer Gonzalez responded that "[i]t was obstructed." However, shortly thereafter, Officer Gonzalez testified that "[t]he sending unit was reading correctly." Leaving Officer Gonzalez's testimony aside, the IJ noted in his oral decision that "[f]requently, from common experience, when a gas gauge reads full, it reads full for a while before dropping. And, how much gas may be consumed by the time that gauge starts dropping, I do not know and I am not going to venture a guess at." In its opinion, the Board presumed that the gas gauge was working properly and accurately reflected the quantity of gas in the tank, but there is no evidence to support such a conclusion. If this unresolved factual issue were key to the Board's review of the IJ's decision in this case, it should have remanded to the IJ for further factual findings. 8 C.F.R. § 1003.1(d)(3)(iv).

Noting Officer Gonzalez's "significant experience inspecting cars at the border," the BIA listed a number of the estimates that Gonzalez made about the gas tank and the amount of gas it contained when Lopez-Rodriguez reached the border, and mentioned Gonzalez's opinion that Lopez-Rodriguez "could not have driven the distance from Puerto Peñasco to the border without refueling and still have 4 to 6 gallons of gas filling up the tank." The BIA does not explain further how Officer Gonzalez's testimony undermines the IJ's finding that Lopez-Rodriguez testified credibly; we are left to draw our own conclusions from the Board's recitation of the officer's testimony.

Our review of the BIA's decision leads us to conclude that the Board accepted as true Officer Gonzalez's estimates and opinions, although the BIA was careful to note that it was simply quoting from Officer Gonzalez's testimony ("As Officer Gonzalez testified," "He stated," "he estimated," and "he concluded"). If the Board had not accepted these statements as true, there would be no basis—other than the supposed contradiction in Lopez-Rodriguez's testimony, discussed *infra* —to reverse the IJ's credibility determination as "clearly erroneous." That the IJ found Officer Gonzalez to have testified *credibly*, however, does not give the Board license to accept as *true* Officer Gonzalez's estimates and opinions about historical factual details when the IJ clearly decided not to make factual findings regarding these disputed issues. The IJ stated that he did not "doubt Officer Gonzalez' [sic] assessment as being made in good faith," but stated twice in his oral decision that whether Lopez-Rodriguez refueled between Puerto Peñasco and Lukeville was unresolved due to insufficient evidence.[7] The IJ concluded that Officer Gonzalez did not lie, but

---

[7]Immediately after citing Officer Gonzalez's good faith, the IJ noted that "in fairness, it may very well be true that the applicant did not put gas in the vehicle prior to getting to the Port of Inspection in Lukeville." Later in his oral decision, he concluded that the case "comes down to whether it was five gallons of gas that were used, thereby necessitating a refilling of the tank. And, I do not think that there is sufficient evidence to show that this applicant has lied and refilled the tank prior to getting to the Port of Inspection in Lukeville."

also concluded that Officer Gonzalez's estimates alone were insufficient to resolve the issue of whether or not Lopez-Rodriguez refueled between Puerto Peñasco and Lukeville. The BIA may not take it upon itself to resolve the issue. 8 C.F.R. § 1003.1(d)(3)(iv).

**[6]** By accepting Officer Gonzalez's estimates and opinions as true, and by stating conclusively that the Dodge truck's gas gauge read full at the Lukeville inspection station, the BIA engaged in impermissible fact-finding in violation of 8 C.F.R. § 1003.1(d)(3)(iv). As noted above, these issues were left unresolved by the IJ, as was the issue of whether the gas gauge accurately reflected the true quantity of gas in the tank. If the BIA wanted specific factual findings on these issues, then the governing regulations required it to remand the case to the IJ instead of making its own factual determinations. *See Brezilien*, 569 F.3d at 413; *Padmore*, 609 F.3d at 69.

### Contradiction in Lopez-Rodriguez's Testimony

The IJ did not identify any contradictions in Lopez-Rodriguez's testimony. The claimed contradiction noted by the BIA in its decision following remand relates to whether or not Lopez-Rodriguez had previously driven his employer's truck into the United States to pick up boat supplies before his trip on July 22, 2006, and if so, how often. The IJ found specifically that Lopez-Rodriguez "has come into the United States on numerous occasions and is basically directed each time by his employer to go to a specific place in Phoenix to pick up supplies for the boat, turn around and come back to his work in Mexico." The IJ did not make any findings as to what specific vehicle or vehicles Lopez-Rodriguez used to drive to the United States on these trips.

The BIA, without specifically referring to this factual determination by the IJ or concluding that the IJ's determination was illogical, implausible, or without support in the record,

found that the IJ "ignored a contradiction" in Lopez-Rodriguez's testimony. The Board stated that Lopez-Rodriguez "first testified that his employer had never asked him to drive the employer's truck into the United States to pick up supplies before. Yet, he later testified that he had driven his employer's truck to the United States very often, as much as every week, in the 3 months before he was arrested at the border." Without further explanation, the BIA used this claimed contradiction as a second basis for finding that the IJ's credibility determination was "clearly erroneous."

The first exchange between the IJ and Lopez-Rodriguez to which the BIA referred in its decision occurred at Lopez-Rodriguez's second master calendar hearing on August 24, 2006, after the government's attorney had finished asking a series of questions about the white Dodge Ram pickup truck that Lopez-Rodriguez was driving on the day in question, and what Lopez-Rodriguez had planned on doing with it that day:

> IJ: How long have you been working for this person [the employer], sir?
>
> L-R: Two years.
>
> IJ: Did he ever ask you to do this before?
>
> L-R: No.
>
> IJ: Have you ever taken a vehicle into the United States before?
>
> L-R: How so? I mean, I, I didn't hear?
>
> IJ: Have you ever taken a vehicle into the United States before?
>
> L-R: No, just with that and my vehicle, that's it.

The IJ did not find that the above exchange contradicted Lopez-Rodriguez's testimony at his removal hearing on September 14, 2006, in which he answered the IJ as follows:

> IJ: How long had you worked for him [the employer]?
>
> L-R: Two years.
>
> IJ: You had gone to Phoenix before?
>
> L-R: Yes.
>
> IJ: Have you driven that truck before?
>
> L-R: I had — I had started driving that truck three months prior to my being stopped, arrested.
>
> IJ: Ever take it to Phoenix before?
>
> L-R: Yes, I was, I was going very often. Every 15 days, every week, once a month.
>
> IJ: In that truck?
>
> L-R: In that truck.

The BIA found that the second exchange contradicted the first.

**[7]** The BIA could not conclude, however, that Lopez-Rodriguez contradicted himself in these two exchanges without drawing factual inferences from Lopez-Rodriguez's answers to the IJ's questions, and without making findings as to the vehicle or vehicles that Lopez-Rodriguez regularly used to drive into the United States for his employer.

In the first exchange that the BIA referenced, the IJ asked, "Have you ever taken *a vehicle* into the United States before?," and Lopez-Rodriguez responded, "No, just with *that and my vehicle*, that's it." (Emphasis added.) As noted above, just before this exchange the government's attorney had asked Lopez-Rodriguez a series of questions about his employer's white Dodge Ram truck. In the second exchange, Lopez-Rodriguez testified that he had been driving the Dodge truck to Phoenix for work regularly for approximately three months prior to July 22, 2006. For the BIA to have found a contradiction in these two exchanges, it would have had to read Lopez-Rodriguez's answer, "No, just with that and my vehicle, that's it," to mean that he had only ever driven his own vehicle and some other vehicle that was not the Dodge truck ("*that*") into the United States.[8] However, both the Board's interpretation of what Lopez-Rodriguez meant when he said "No, just with that and my vehicle, that's it," and its conclusion regarding the vehicle or vehicles Lopez-Rodriguez regularly drove into the United States for his employer, required the Board to make prohibited findings of fact. If this factual determination was essential to the Board's review of the IJ's decision, it should have remanded to the IJ for additional factual findings. *See* 8 C.F.R. § 1003.1(d)(3)(iv); *Padmore*, 609 F.3d at 69; *Brezilien*, 569 F.3d at 413.

**[8]** That the Board engaged in de novo review of the IJ's factual findings is evident in its selective review of Lopez-Rodriguez's testimony. Specifically, the BIA ignored a third exchange that explained Lopez-Rodriguez's other responses to the IJ and supported his testimony that he had driven the Dodge truck to the United States for work previously.

---

[8]This interpretation seems to ignore both the context of the exchange between the IJ and Lopez-Rodriguez and the normal vagaries of human speech, especially when that speech is translated into English. Prior to this exchange, the government's attorney had just asked Lopez-Rodriguez about the Dodge Ram truck. The most logical interpretation of "just with that and my vehicle" is that "that" referred to the Dodge truck, given that Lopez-Rodriguez had just been discussing it.

Towards the end of the second master calendar hearing, the IJ and Lopez-Rodriguez engaged in the following exchange:

> IJ: You've never done this [drug smuggling] before?
>
> L-R: No.
>
> IJ: When did you get your border crossing card? What year?
>
> L-R: I don't recall exactly what year.
>
> IJ: Approximately? How long have you had it?
>
> L-R: Since six year [sic], seven years.
>
> IJ: You never had a problem before?
>
> L-R: No.
>
> IJ: And, do you come into the United States?
>
> L-R: Well, I would just go on business, that's it.
>
> IJ: And, what business is that?
>
> L-R: Shipping business. It would be every 15 days, you know, every month or every, every week.
>
> IJ: For this boss also?
>
> L-R: Yes.
>
> IJ: *Were you driving other vehicles for this boss into the United States?*
>
> L-R: *No, that was the only one. Sometimes I would go in my vehicle.*

(Emphases added). Although Lopez-Rodriguez does not mention the length of time that he had been using the Dodge Ram truck to run errands for his boss, this exchange undermines the BIA's assertion that Lopez-Rodriguez contradicted himself in his testimony. As the Tenth Circuit concluded in *Kabba*, "when rejecting the IJ's credibility findings under a review purportedly targeted only at clear error, the BIA cannot selectively examine some evidence while ignoring other evidence presented to it." 530 F.3d at 1247. In so doing, the BIA substituted its own reading of the evidence for that of the IJ without applying the deference required by the clear error standard of review. That is an error of law under the BIA's own regulations. 8 C.F.R. § 1003.1(d)(3)(i).

*Credibility Determination*

**[9]** Finally, the BIA found the IJ's decision to be "clearly erroneous" on the basis of its own determination of Lopez-Rodriguez's credibility. As the Supreme Court noted in *Anderson*, a credibility determination is based, at least in part, on "variations in demeanor and tone of voice" that only the factfinder witnesses. 470 U.S. at 575. Although an appellate court or other reviewing body may find clear error in a factfinder's credibility determination if a witness's story is contradicted by the evidence or is internally inconsistent or implausible, a factfinder may nevertheless credit one witness's testimony over another's if both have related coherent and facially plausible stories that are not contradicted by extrinsic evidence. *See id.* Such a decision "can virtually never be clear error." *Id.*

**[10]** Here, both Lopez-Rodriguez and Officer Gonzalez told coherent and facially plausible stories. The IJ believed both and concluded that there was not enough evidence to show that Lopez-Rodriguez was lying. Although the IJ found that both Officer Gonzalez and Lopez-Rodriguez testified credibly, the BIA decided instead, on the basis of the paper record, that only the testimony of Officer Gonzalez was truth-

ful. The BIA has not identified sufficient evidence, however, to show that the IJ's credibility determination with respect to Lopez-Rodriguez was "clearly erroneous" under the deferential clear error standard of review. Instead, it relied upon its own factual findings and de novo review of the evidence. The BIA's independent credibility determination, therefore, constitutes improper de novo review. *See Anderson*, 470 U.S. at 575; *Hinkson*, 585 F.3d at 1262.

*Conclusion*

Although the BIA invoked the clear error standard, it failed to apply this deferential standard of review. This is an error of law that requires that we grant Lopez-Rodriguez's petition and remand the case to the agency. 8 C.F.R. § 1003.1(d)(3)(i); *Brezilien*, 569 F.3d at 413; *see also Kabba*, 530 F.3d at 1245-46; *Chen*, 470 F.3d at 515.

The BIA made its own findings as to the accuracy of the historical facts discussed in Officer Gonzalez's testimony and the supposed contradiction in Lopez-Rodriguez's testimony. The Board further engaged in prohibited de novo review in finding a contradiction in Lopez-Rodriguez's testimony and in making its own finding regarding Lopez-Rodriguez's credibility. Both are disallowed by the agency's own regulations. 8 C.F.R. § 1003.1(d)(3)(i), (iv).

## V.

This case clearly lacks a robust factual basis on which to determine whether Lopez-Rodriguez drove to the border knowing that there were drugs in his employer's truck's gas tank. It is not up to the BIA, however, to create one on its own. The BIA improperly found facts and applied de novo review to the IJ's decision, and we therefore remand this case to the agency so that the BIA may apply the correct "clear error" standard of review. If the BIA concludes that it cannot properly review the IJ's decision without further factual

development of the record, then the Board must remand the case to the IJ so that he may make the requisite factual findings.

Because we conclude that the BIA erred in its application of the clear error standard of review and erred by making factual findings, and remand on that basis, we need not resolve whether a "reason to believe" under INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C) is the equivalent of the probable cause standard under the Fourth Amendment.

**GRANTED AND REMANDED.**