**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DENNIS QUIAMBAO VITUG,
*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,
*Respondent*.

No. 07-74754

BIA No.
A095-728-132

DENNIS QUIAMBAO VITUG,
*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,
*Respondent*.

No. 08-71038

BIA No.
A095-728-132

DENNIS QUIAMBAO VITUG,
*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,
*Respondent*.

No. 08-72088

BIA No.
A095-728-132

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 7, 2013—Pasadena, California

Filed July 24, 2013

Before: Harry Pregerson, William A. Fletcher, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Pregerson

## SUMMARY[*]

### Immigration

The panel granted in part a petition for review because the Board of Immigration Appeals violated its factfinding authority in reversing an immigration judge's grant of withholding of removal to a homosexual native and citizen of the Philippines.

The panel held that the Board erred by engaging in its own factfinding, rather than clear error review, in violation of 8 C.F.R. § 1003.1(d)(3)(i), when it determined that the harm petitioner suffered did not rise to the level of past persecution, and that the Philippine government was not unwilling or

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

unable to protect petitioner.  The panel further held that the Board abused its discretion by ignoring evidence.

The panel held that substantial evidence supported the Board's determination that petitioner failed to establish a clear probability of torture, but it remanded for the Board to grant withholding of removal because no reasonable factfinder could conclude that the harm petitioner suffered did not rise to the level of persecution, and the government failed to meet its burden of proof to show changed country conditions such that petitioner no longer faces a threat to his life or freedom in the Philippines.

## COUNSEL

Joanna S. McCallum, Manatt, Phelps, & Phillips, LLP, Los Angeles, California, for Petitioner.

Carol Federighi, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for Respondent.

## OPINION

PREGERSON, Circuit Judge:

Dennis Vitug, a native and citizen of the Philippines, petitions for review of the Board of Immigration Appeals' ("BIA") order vacating an immigration judge's ("IJ") grant of withholding of removal and protection under the Convention Against Torture ("CAT").  We have jurisdiction under

8 U.S.C. § 1252. The evidence compels the conclusion that Vitug will more likely than not be persecuted if he is removed to the Philippines. We therefore grant the petition in part, reversing the BIA's denial of withholding of removal.

## I. BACKGROUND

### A. Factual Background

Dennis Vitug is a 37-year-old gay native and citizen of the Philippines. From the age of three, Vitug knew he was "different." He was effeminate and played with Barbie dolls and other toys meant for girls, which his family resented. Throughout his childhood, Vitug was teased and bullied by his classmates for "being a sissy." When he was eight or nine years old, Vitug was sexually abused by a man his grandparents hired to do housework and take him to school. This man sexually abused Vitug for two years and threatened to kill him and his family if he ever told anyone.

In high school, Vitug continued to be teased and bullied by his classmates because of his perceived effeminate behavior and homosexuality. The principal called Vitug into his office numerous times, threatening to expel him if he did not change and "act accordingly." School administrators also asked Vitug's parents to intervene or risk Vitug's expulsion.

In 1991, after Vitug's family lost their home in the volcanic eruption of Mount Pinatubo, Vitug sought to live with his extended family members, but was turned away because of his sexual orientation. At the age of sixteen, Vitug moved to Manila alone. He tried to find a job, but was unsuccessful. At the age of seventeen, Vitug was drugged and raped by a man he met at a gay bar.

In Manila, Vitug was harassed and threatened by police officers while he was waiting for a public bus. The officers targeted him because of his sexual orientation and threatened to take him to jail for loitering if he did not give them money. Vitug was also beaten and robbed five times on the street by private citizens. The attackers called him derogatory names, and two of the beatings were severe. Vitug never reported the attacks to the police because—based on his personal experiences with the police as well as reports of police abuse of gay men—he feared the police would ridicule and further victimize him.

Vitug first came to the United States in 1996 on a tourist visa. Six months later, when his visa expired, he returned to the Philippines. Vitug again tried to find a job in Manila but was unsuccessful because of his sexual orientation. In 1999, Vitug returned to the United States. This time he remained, overstaying his tourist visa. Vitug worked as an assistant designer and as an auditor for the Radisson Hotel in Sherman Oaks, California.

Around 2001, Vitug became addicted to crystal methamphetamine. Despite seeking drug counseling and rehabilitation for his addiction, Vitug repeatedly relapsed and was arrested several times for drug possession. Despite these setbacks, Vitug worked as a shipping clerk and enrolled in Los Angeles Trade Technical College, taking fashion design courses.

In 2005, Vitug was diagnosed with HIV. This diagnosis led to depression and another drug relapse. Vitug was subsequently arrested again for possession of methamphetamine, and sentenced to one year in state prison. After serving eight months of his sentence, Vitug was served

with a Notice to Appear in immigration court. The Department of Homeland Security ("DHS") charged Vitug with being removable on the grounds that he overstayed his visa and was convicted of a controlled substance offense.

**B. Procedural History**

In April 2007, Vitug appeared *pro se* in immigration court. Vitug admitted the charges against him and applied for asylum, withholding of removal, and CAT relief based on his sexual orientation and HIV-positive status.

At Vitug's June 2007 merits hearing, the IJ found Vitug to be credible. The IJ made factual findings based on Vitug's testimony and documentary evidence that Vitug had provided. The documentary evidence included articles about an organized raid by the Philippine National Police on a theater frequented by gay men. During this raid, police beat patrons, stole their money, and arrested them for "public scandal" or immoral or indecent activity. The IJ's findings included:

> (1) Vitug was beaten and robbed five times in Manila after being targeted as a homosexual. Two of these beatings were severe.

> (2) While waiting for the bus in Manila, Vitug was harassed by police officers on account of his perceived sexual orientation. The officers threatened to arrest him for loitering if he did not give them money.

(3)  Vitug was unable to find a job in the Philippines on account of his sexual orientation.

(4)  The police will not do anything to help gay men who report abuse but will rather ridicule them and tell them they deserve it.

(5)  The government has failed or refused to protect gay men from persecution.

At the hearing, the government agreed that Vitug was credible.  The government did not present any evidence to contradict Vitug's testimony or documentary evidence. However, it did note that Vitug's documentary evidence included accounts of gay and lesbian activism in the Philippines and a recently passed Quezon city ordinance prohibiting sexual orientation discrimination in the workplace.

The IJ held that Vitug was persecuted on account of his membership in the social group of homosexual Filipino men.[1] The IJ noted that the government did not prove that country conditions had improved or that Vitug could internally relocate within the Philippines to avoid future persecution. The IJ concluded that Vitug would more likely than not suffer further persecution if he was removed to the Philippines, and therefore granted Vitug withholding of removal.  The IJ also concluded that it was more likely than not that Vitug would be tortured in the Philippines, and therefore granted CAT

---

[1] The IJ found that Vitug did not suffer past persecution on account of his membership in the group of HIV-positive individuals.

relief. Finally, the IJ denied Vitug's request for asylum because of a procedural bar.

The government appealed. On November 6, 2007, the BIA sustained DHS's appeal, affirming the IJ's denial of asylum but vacating the IJ's grant of withholding of removal and CAT relief. In reaching its decision, the BIA did not expressly find any of the IJ's factual findings to be clearly erroneous. Instead, the BIA found that Vitug "failed to meet his burden of proof" for four major reasons: (1) Vitug failed to prove that the attacks against him "r[o]se to the level of past persecution"; (2) the rape was a "crime of opportunity" and was not based on account of a protected ground; (3) "the record does not support the conclusion that the government would be unable or unwilling to protect [Vitug]," because Vitug returned to the Philippines with "only limited additional problems," the attacks against him were illegal, and he did not report the attacks; and (4) there was "no evidence in the record that [Vitug] would face torture were he to be returned to the Philippines."

Vitug moved for reconsideration, which the BIA denied because Vitug's motion was one day late. The motion was late due to a snowstorm and the grounding of FedEx's planes.

On February 26, 2008, the BIA issued an amended order to correct a misstatement in the original November 6, 2007 order. Vitug timely moved for reconsideration of the amended order, arguing that the BIA failed to give due deference to the IJ's factfinding.

On April 22, 2008, the BIA denied Vitug's motion for reconsideration of the amended order. In its denial, the BIA defended its original decision, arguing that it had properly

applied the clear error standard of review: "[W]e did not determine that the Immigration Judge's findings of facts were clearly erroneous, including the finding that he was credible. Therefore, we accepted the respondent's testimony, and all reasonable inferences that can be drawn from it, as true." Yet, later in the order, the BIA contradicted itself by stating that one of the IJ's findings —that the Philippine government "failed or refuse[d] to protect homosexuals" from abuse—*was* "clearly erroneous." The BIA concluded that: (1) Vitug failed to establish that the government was unwilling or unable to protect him in light of the documentary evidence that showed no official discrimination, Vitug's testimony that he was never "harmed" by the police, and Vitug's failure to report any of his attacks; (2) on the record before it, the facts were insufficient for Vitug to carry his burden of proving past persecution; and (3) on the record before it, the facts were insufficient for Vitug to prove that it was more likely than not he would be persecuted if he returned to the Philippines.

## II. STANDARD OF REVIEW

Our review is limited to the BIA's decision where the BIA conducts its own review of the evidence and law, "except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000)). "Where the standard of review the BIA employed is unclear, we may look to both the BIA's decision and the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Benyamin v. Holder*, 579 F.3d 970, 974 (9th Cir. 2009) (internal quotation marks omitted).

We review for substantial evidence the factual findings underlying the BIA's determination that a petitioner is not eligible for withholding of removal or CAT protection. *Morales v. Gonzales*, 478 F.3d 972, 977, 983 (9th Cir. 2007), *abrogated on other grounds as stated in Anaya-Ortiz v. Holder*, 594 F.3d 673, 678 (9th Cir. 2010). Under substantial evidence review, "[t]o reverse [the BIA finding], we must find that the evidence not only supports that conclusion, but compels it." *Zheng v. Holder*, 644 F.3d 829, 835 (9th Cir. 2011) (citation and internal quotation marks omitted).

De novo review applies to the BIA's determinations of questions of law and legal conclusions. *Hamazaspyan v. Holder*, 590 F.3d 744, 747 (9th Cir. 2009). Whether the BIA applied the correct standard of review to the IJ's decision is a question of law, and is thus reviewed de novo. *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012).

## III.  DISCUSSION

### A.  BIA's Failure to Use Proper Clear Error Standard of Review

Under DHS regulations, the BIA may review questions of law de novo. 8 C.F.R. § 1003.1(d)(3)(ii). The BIA has interpreted "questions of law" to include not only pure questions of law but also the application of a particular standard of law to a set of facts, for example, "whether the facts established by an alien amount to past persecution or a well-founded fear of future persecution." *Matter of A-S-B-*, 24 I. & N. Dec. 493, 496 (BIA 2008) (citation and internal quotation marks omitted); *see also Matter of V-K-*, 24 I. & N. Dec. 500, 501 (BIA 2008).

DHS regulations prohibit the BIA from "engag[ing] in de novo review of findings of fact determined by an immigration judge." 8 C.F.R. § 1003.1(d)(3)(i). Instead, "[f]acts determined by the immigration judge, including findings as to the credibility of the testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." *Id.* "Facts include past events, but they are not restricted to historical events." *Kaplun v. Att'y Gen.*, 602 F.3d 260, 269 (3d Cir. 2010). They also include "states of mind such as intentions and opinions," *id.* (internal quotation marks deleted), and "expressions of likelihood based on testimony (both lay and expert) and/or documentary evidence," *id.* at 270. Where there are mixed questions of fact and law, the BIA "must break down the inquiry into its parts and apply the correct standard of review to the respective components; it cannot "glue[] the two questions together" and review the factual question de novo. *Id.* at 271; *see also Ridore v. Holder*, 696 F.3d 907, 915–16 (9th Cir. 2012).

Further, "[t]he BIA cannot, under a clear error standard of review, override or disregard evidence in the record and substitute its own version of reality" or "rel[y] simply on its own interpretation of the facts." *Ridore*, 696 F.3d at 917. Under clear error review, if the BIA rejects a finding of the IJ, a "conclusory pronouncement" that the IJ has erred is insufficient; "the BIA [is] obligated to explain why the IJ clearly erred in so finding." *Id.* If the IJ has left certain facts unresolved and the BIA believes that it cannot decide the case without them, it cannot make its own factual findings but instead "must remand to the IJ for further factual findings." *Rodriguez*, 683 F.3d at 1173.

In its denial of Vitug's second motion for reconsideration, the BIA stated that it had applied the proper clear error standard of review in its original decision. As we stated in *Rodriguez*, however: "[w]e do not rely on the Board's invocation of the clear error standard; rather, when the issue is raised, our task is to determine whether the BIA faithfully employed the clear error standard or engaged in improper de novo review of the IJ's factual findings." *Id.*

We conclude that in its original November 6, 2007 decision, the BIA engaged in its own factfinding. Such factfinding was improper under *Rodriguez*, which dictates that the BIA must remand to the IJ for additional factfinding under the clear error standard of review. *Id.* In determining that the attacks against Vitug did not "rise to the level of past persecution," the BIA made a factual finding that the IJ never made—that "the alleged rape . . . was more a crime of opportunity." And in determining that "the record does not support the conclusion that the government would be unable or unwilling to protect [Vitug]," the BIA made additional factual findings that the IJ never made: (1) that Vitug faced "only limited additional problems" when he returned to the Philippines; (2) that the abuse and attacks against Vitug in Manila were illegal; and (3) that there was a "lack of official discrimination against homosexuals" in the Philippines. These are findings about past events and about the intentions of others, and thus the BIA was not entitled to make them in the first instance.

Moreover, the BIA abuses its discretion where it ignores arguments or evidence. "[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and

failing to mention highly probative or potentially dispositive evidence." *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011).

In its original decision, the BIA ignored factual findings of the IJ that were key to the IJ's holding: (1) that Vitug was beaten five times on the street, and two of these beatings were "severe"; (2) that Vitug was harassed and threatened by the police because of his perceived sexual orientation; (3) that Vitug was unable to obtain employment in the Philippines; and (4) that "police [in the Philippines] will not do anything to help gay men who report abuse." The BIA did not reject these findings as clearly erroneous, so its disregard of this evidence was not only a failure to apply clear error review but also an abuse of its discretion. *Id.*

We conclude that the BIA failed to apply the clear error standard of review to the IJ's factual findings, and also abused its discretion by ignoring factual findings of the IJ. In similar situations, we typically remand so that the BIA may apply the correct standard of review and properly consider the IJ's factual findings. *See, e.g.*, *Ridore*, 696 F.3d at 922; *Rodriguez*, 683 F.3d at 1177; *Brezilien v. Holder*, 569 F.3d 403, 415 (9th Cir. 2009). However, we need not do so here because, as we explain below, substantial evidence does not support the BIA's denial of withholding of removal. *See Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11 (9th Cir. 2004) (declining to remand for fact-finding where petitioner showed past persecution and government made no showing of changed circumstances).

## B.  Withholding of Removal

Withholding of removal is a form of relief from deportation for an alien who would be persecuted on account of her race, nationality, religion, political opinion, or membership in a particular social group were she to return to her native country.  8 U.S.C. § 1231(b)(3).  An alien who shows that it is "more likely than not" that she would be persecuted on account of a protected ground by the government or an actor the government is unable or unwilling to control meets the requirements of withholding of removal and may not be removed to her native country.  8 C.F.R. § 208.16(b)(2);  *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001).  We have held that homosexuals are a "particular social group," and therefore that homosexuality is a protected ground.  *See Karouni v. Gonzales*, 399 F.3d 1163, 1171–72 (9th Cir. 2005).

Eligibility for withholding of removal is presumed if a petitioner shows past persecution.  *Mousa v. Mukasey*, 530 F.3d 1025, 1030 (9th Cir. 2008).  An alien who seeks withholding of removal "on the basis of past persecution at the hands of private parties the government is unwilling or unable to control need not have reported the persecution to the authorities if he [or she] can convincingly establish that doing so would have been futile or have subjected him [or her] to further abuse." *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006).  To  rebut the presumption created by past persecution, the government must show by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the [petitioner]'s life or freedom would not be threatened" or that the petitioner could relocate internally within his home

country to avoid persecution. 8 C.F.R. § 1208.16(b)(1); *see also Hanna v. Keisler*, 506 F.3d 933, 940 (9th Cir. 2007).

In *Ahmed v. Keisler*, 504 F.3d 1183 (9th Cir. 2007), we reversed the BIA's denial of asylum and withholding of removal where the petitioner had been beaten three times by the Bengali police or army on account of his political opinion. We reasoned,

> [p]hysical harm has consistently been treated as persecution. Where an asylum applicant suffers such harm on more than one occasion, and, as in this case, is victimized at different times over a period of years, the cumulative effect of the harms is severe enough that no reasonable fact-finder could conclude that it did not rise to level of persecution.

*Id.* at 1194 (citations omitted). In *Ahmed*, the government did not rebut the presumption of withholding of removal eligibility generated by past persecution. Thus, we concluded that the BIA's decision that the petitioner was not entitled to withholding of removal was not supported by substantial evidence. *Id.* at 1200.

Here, the IJ found Vitug to be credible and thus accepted his testimony, and all reasonable inferences drawn from that testimony, as true. At the hearing, the government agreed that Vitug was credible and did not introduce any evidence to contradict his testimony. On appeal, the BIA did not reject any of the IJ's factual findings as clearly erroneous. Thus, in determining whether the facts in Vitug's case compel a finding of withholding of removal eligibility, we consider the

factual findings of the IJ, which were based on Vitug's credible testimony.

Like the petitioner in *Ahmed*, Vitug showed that he was beaten multiple times over a period of years. Vitug demonstrated that two of these beatings were severe. Vitug also demonstrated that he is gay and perceived to be effeminate and that his attackers called him names and beat him because he was gay. While Vitug did not report these attacks, he credibly testified that it is well known in the Philippines that police harass gay men and turn a blind eye to hate crimes committed against gay men. Vitug bolstered this testimony with documentary evidence of a police raid on a gay theater during which police beat and robbed the patrons. Moreover, he credibly testified to his personal experience of being threatened and harassed by police in the Philippines. Vitug thus "convincingly establish[ed] that [reporting the attacks] would have been futile or have subjected him to further abuse," thereby demonstrating that the government was unwilling to control the attackers. *Ornelas-Chavez*, 458 F.3d at 1058.

In addition to being physically harmed on account of his sexual orientation, Vitug was unable to find a job in the Philippines because of his sexual orientation. Thus, Vitug also faced the "deprivation of . . . employment," which the IJ noted the BIA has found to be another form of persecution. *Matter of T-Z-*, 24 I&N Dec. 163 (BIA 2007).

As in *Ahmed*, no reasonable factfinder could conclude that the harm Vitug suffered did not rise to the level of persecution in light of the cumulative effect of multiple instances of physical harm and victimization. Thus, we

presume that Vitug is eligible for withholding of removal relief.

As the IJ found, the government did not rebut the presumption of withholding of removal eligibility by showing either a fundamental change in country conditions or that it was possible for Vitug to internally relocate within the Philippines to avoid persecution. In fact, the government did not introduce any evidence at Vitug's hearing. The government did refer to Vitug's documentary evidence regarding gay activism in the Philippines and the passage of a local ordinance in Quezon to protect homosexuals from employment discrimination. Such evidence, however, does not indicate that there is any less violence against gay men or that police have become more responsive to reports of anti-gay hate crimes. The government therefore failed to meet its burden of proof to show by a preponderance of the evidence that the circumstances within the Philippines have changed such that Vitug no longer faces a threat to his life or freedom in the Philippines. Accordingly, we reverse the BIA's denial of withholding of removal relief under the substantial evidence standard.

## C.  CAT Claim

To qualify for CAT relief, a petitioner must show that she more likely than not will be tortured if she is removed to her native country. *Zheng*, 644 F.3d at 835. DHS regulations define torture as an "act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official . . . ." 8 C.F.R. § 208.18(a)(1). The regulations

further state, "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  8 C.F.R. § 208.18(a)(2). We have held that "awareness and willful blindness" are sufficient to constitute acquiescence by government officials; actual knowledge or willful acceptance is not required.  *Zheng v. Ashcroft*, 332 F.3d 1186, 1197 (9th Cir. 2003).

On this record, substantial evidence does not compel a finding that Vitug will more likely than not be tortured if he returns to the Philippines.  In *Ahmed*, although we reversed the BIA's denial of withholding of removal, we found that substantial evidence did support the BIA's denial of CAT relief.  504 F.3d at 1200–01.  We reasoned that while the four beatings Ahmed suffered were "certainly forms of persecution, it is not clear that these actions would rise to the level of torture" under substantial evidence review.  *Id.* at 1201.  Similarly, it is not clear that Vitug's beatings and economic deprivation rise to the level of torture.  Thus, we deny Vitug's petition for review of the BIA's denial of CAT relief.

## IV.  CONCLUSION

For the reasons set forth above, we grant the petition for review as to Vitug's application for withholding of removal, deny the petition as to Vitug's application for CAT relief, and remand with instruction that the BIA enter an order granting withholding of removal.

**PETITION GRANTED IN PART, DENIED IN PART, AND REMANDED.**