**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE L. ZUMEL,<br>*Petitioner*,<br><br>v.<br><br>LORETTA E. LYNCH, Attorney General,<br>*Respondent*. | No. 12-70724<br><br>Agency No.<br>A079-192-469<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 12, 2015—San Francisco, California

Filed September 29, 2015

Before: Diarmuid F. O'Scannlain and Sandra S. Ikuta,
Circuit Judges and James A. Teilborg,[*] Senior District
Judge.

Opinion by Judge Ikuta

---

[*] The Honorable James A. Teilborg, Senior District Judge for the U.S.
District Court for the District of Arizona, sitting by designation.

## SUMMARY[**]

### Immigration

The panel granted Jose L. Zumel's petition for review of the Board of Immigration Appeals' decision finding him inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activity.

The panel held that the BIA correctly found that an attempted coup against the Philippine government in 1989 was unlawful under Philippine law, and that Zumel "engaged" in the coup by planning it. For purposes of this appeal, the panel assumed that the question of coup participants' "intent to endanger, directly or indirectly, the safety of one or more individuals" under § 1182(a)(3)(B)(iii)(V)(b) is a factual question, and held that the BIA erred in failing to apply the clear error standard of review to the Immigration Judge's finding that the coup participants lacked such intent. The panel remanded for the BIA to review the IJ's factual findings regarding intent for clear error.

### COUNSEL

Carrie Rosenbaum (argued), Law Offices of Carrie Rosenbaum, Alameda, California; Nancy Ann Fellom, Law Offices of Fellom and Solorio, San Francisco, California, for Petitioner.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Mark Christopher Walters (argued), Senior Counsel for National Security; Stuart F. Delery, Principal Deputy Assistant Attorney General; Michael P. Lindemann, Chief, National Security Unit, United States Department of Justice, Office of Immigration Litigation, Appellate Court Section, Civil Division, Washington, D.C., for Respondent.

## OPINION

IKUTA, Circuit Judge:

Jose Maria Carlos De Leon Zumel, a native and citizen of the Philippines, petitions for review of a decision of the Board of Immigration Appeals (BIA) ruling that he is inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activity, and dismissing his appeal from the Immigration Judge's (IJ) order of removal. We have jurisdiction pursuant to 8 U.S.C. § 1252, and hold that the BIA did not err when it determined that an attempted coup against the Philippine government was unlawful under Philippine law, and that Zumel "engaged" in the coup by planning it. But assuming that the question whether the coup participants lacked an "intent to endanger, directly or indirectly, the safety of one or more individuals," 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b), is a question of fact, the BIA erred in failing to apply clear error review to the IJ's finding that the coup participants lacked such intent. *See* 8 C.F.R. § 1003.1(d)(3)(i). We therefore grant the petition for review and remand to the BIA.

I

This appeal relates to Zumel's activities during a period of political instability in the Philippines from 1986 to 1989. In 1986, Zumel was serving as a general in the Philippine Air Force. In February of that year, then-President Ferdinand Marcos held snap elections. Despite allegations of election fraud, the Philippine Congress adopted a resolution declaring that Marcos received the highest numbers of votes and proclaiming him president. However, a mass demonstration of support for Marcos's opponent, Corazon Aquino, ultimately led Marcos to flee to the United States in exile and Aquino to take power.

After Aquino took power, Zumel became a leader of an opposition group known as Alyansang Tapat sa Sambayanan (ALTAS). ALTAS was a faction of the military that believed Marcos was the legitimate elected leader of the Philippines. To demonstrate their continued support for Marcos, ALTAS members, including Zumel, attended a swearing-in ceremony for Marcos's vice-presidential running mate at the Manila Hotel on July 6, 1986. As a result of Zumel's attendance at the swearing-in ceremony, the Air Force removed him from active duty and placed him on an on-call assignment.

Despite his removal from active duty, Zumel remained active in ALTAS. In January 1987, ALTAS staged a coup against the Aquino government. Zumel participated in planning the coup, including deciding which bases to target. In order to destabilize the Aquino government and pave the way for Marcos to return to power, ALTAS decided to take over two air force bases, Villamor Air Force Base (Villamor AFB) and Sangley Air Force Base (Sangley AFB), and a television station in Manila. The ALTAS forces took over

Villamor AFB for about one hour, but succeeded in taking over Sangley AFB for two days. During that period, ALTAS detained the Sangley AFB commander on the premises and prevented him from communicating with his troops. After two days, the Philippine military forces supporting Aquino suppressed the attempted takeover.

Zumel was not involved in tactical decisions about how best to deploy the ALTAS forces on the ground. Rather, his role during the operation was to coordinate the actions of the opposition air force units and send reinforcements to assist the troops if necessary. While the attempted coup was underway, Zumel monitored the radio from a safe house. He was unable to communicate with the ALTAS leaders at Sangley AFB, however, because the battery on his radio died, and he never sent any reinforcements to Villamor AFB because the Philippine military regained control too quickly.

After the January 1987 coup attempt failed, Zumel went underground, and the Aquino government issued warrants for his arrest. According to the government, the warrants charged Zumel with violating the Philippine Articles of War, specifically Article 67 ("Mutiny or Sedition") and Article 117 ("Officers, Separation from Service"). *See* An Act for Making Further and More Effectual Provisions for the National Defense by Establishing a System of Military Justice for Persons Subject to Military Law, Comm. Act No. 408, arts. 67, 117 (1938), 2 P.L. Comm. Ann., p. 781, 805, 817 (Phil.). While underground, Zumel continued to take a leadership role in ALTAS, and served as the point of contact for individuals wishing to join the movement. He also communicated with Lieutenant Colonel Gregorio Honasan, the leader of Reform the Armed Forces Movement, which also opposed Aquino.

Zumel, Honasan, and other opposition groups began planning another attempt to unseat the Aquino government. This effort (the largest of the opposition initiatives) took place in November 1989, and involved the coordinated efforts of multiple organizations. According to the government, over 3,000 opposition troops participated. In this coup attempt, the opposition attempted to take over Villamor AFB, Sangley AFB, and the Aguinaldo Headquarters of the Armed Forces of the Philippines. The attempt was initially successful: Honasan's troops took control of Sangley AFB, and used it to launch air attacks on the Aguinaldo Headquarters. Zumel's role during the operation was to coordinate reinforcement troops for Sangley AFB. From his position in a safe house, Zumel monitored the radio communications between ALTAS members and the Philippine military, and sent reinforcement troops to Sangley AFB. These reinforcements were forced to turn back when the United States Air Force sent fighter planes to help the Aquino regime gain control. Although the opposition troops held on to Sangley AFB and the Army Headquarters for several days, and controlled Villamor AFB for a few hours, the coup was ultimately defeated with American assistance. According to Zumel, the coup attempt resulted in approximately 30 to 50 casualties on both sides. After this second coup attempt, the Aquino government charged Zumel with an additional count of rebellion and sedition for his participation in the 1989 coup.

The Aquino government and ALTAS, represented by Zumel as its chairman, began negotiating a peace agreement in 1992, and reached an agreement on May 29, 1995. ALTAS members agreed to surrender "all equipment, firearms, ammunitions and explosives in their possession." In turn, the Aquino government agreed that the ALTAS members named on a list later provided by Zumel "shall be

granted a general and unconditional amnesty for crimes committed in pursuit of political belief during the period 26 February 1986 to 30 April 1994." Zumel was one of the ALTAS members who received amnesty. Zumel's "Certificate of Amnesty" stated:

> This is to certify that Jose Ma. Carlos L. Zumel was granted AMNESTY for acts constituting Rebellion / Coup d'etat committed during the period from February 26, 1986 to April 30, 1994 on June 23, 1995 pursuant to the provisions of Proclamation No. 347, issued on March 25, 1994 by His Excellency, President Fidel V. Ramos.

In September 2000, Zumel traveled to the United States on a visitor's visa. He applied for lawful permanent residency through his daughter the next month. The application did not mention Zumel's involvement in ALTAS, and it falsely stated that Zumel had never been charged with violating any law in the United States or elsewhere, and had never been a beneficiary of amnesty. On April 12, 2001, the former Immigration and Naturalization Service (Service)[1] granted Zumel permanent residency status.

On November 29, 2002, after a short visit to the Philippines, Zumel arrived at Los Angeles International Airport, where an immigration officer referred him to

---

[1] On March 1, 2003, Congress transferred the functions of the former INS to the newly formed Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, 116 Stat. 2135 (2002). For the sake of simplicity, we refer to both the former INS and the current DHS as "the Service."

secondary inspection. The Service subsequently served Zumel with a Notice to Appear, charging Zumel with being an arriving alien who was subject to removal under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for engaging in terrorist activities.[2] Zumel's case was referred to an IJ, and Zumel filed a motion to terminate the proceedings on the ground that he had not engaged in terrorist activity.

## II

Before examining the IJ and the BIA's rulings on Zumel's motion to terminate the proceedings, we first explain the statutory provisions that render aliens who have "engaged in a terrorist activity" ineligible to receive visas or to be admitted to the United States. *See generally* 8 U.S.C. § 1182(a)(3)(B).

Under 8 U.S.C. § 1182(a)(3)(B)(i)(I), "[a]ny alien who . . . has engaged in a terrorist activity . . . is inadmissible." The term "engage in terrorist activity" is defined to include committing or inciting to commit a terrorist activity "under circumstances indicating an intention to cause death or serious bodily injury," preparing or planning a terrorist activity, and soliciting others to engage in terrorist activity, either "in an individual capacity or as a member of an organization." *Id.* § 1182(a)(3)(B)(iv). It also includes soliciting individuals "for membership in a terrorist organization described in [§ 1182(a)(3)(B)(vi)(III)] unless the

---

[2] The Service also charged Zumel with being removable under 8 U.S.C. § 1182(a)(6)(C)(i) for willfully misrepresenting a material fact on his application for adjustment of status to lawful permanent resident and under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for being an alien not in possession of a valid immigrant visa. Neither charge is before us on appeal.

solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(V)(cc).

A "terrorist organization" is defined in § 1182(a)(3)(B)(vi)(III) to mean "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activity. *Id.* § 1182(a)(3)(B)(vi)(III).

Finally, "terrorist activity" is defined to mean "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)." *Id.* § 1182(a)(3)(B)(iii). "Terrorist activity" must also involve one of six enumerated activities, including "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," or "[a] threat, attempt, or conspiracy" to do the foregoing. *Id.*[3]

---

[3] 8 U.S.C. § 1182(a)(3)(B)(iii) provides in full:

> As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

We have held that an armed attack "by dissidents on the military of a country," including attacking the military's convoy, constitute terrorist activity under § 1182(a)(3)(B)(iii). *Khan v. Holder*, 584 F.3d 773, 785 (9th Cir. 2009).

While these interlocking definitions cover a wide range of activities, we focus on the statutory language relevant to this appeal: an alien is inadmissible if the alien (1) planned an activity either individually or as a member of an organization, 8 U.S.C. § 1182(a)(3)(B)(iv)(II), (2) that was unlawful under

---

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any–

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

the laws of the place where it was committed, *id.* § 1182(a)(3)(B)(iii), and (3) involved the use of explosives, firearms or other weapons or dangerous devices, *id.* § 1182(a)(3)(B)(iii)(V)(b), (4) with the intent to endanger, directly or indirectly, the safety of individuals or cause substantial damage to property, *id.*

### III

We now turn to the IJ and the BIA's rulings. The IJ held three evidentiary hearings and issued both an interim and final decision in this case. The IJ first determined, as an issue of first impression, that the government had the burden of proving that Zumel was inadmissible at the time he adjusted status, and therefore was never "lawfully admitted for permanent residence," *see* 8 U.S.C. § 1101(a)(13)(C), because he had engaged in terrorist activity.[4]

Next, the IJ considered whether Zumel had "engaged" in the 1989 coup attempt, and whether it was a "terrorist activity" within the meaning of the statute.[5] The IJ found that

---

[4] Zumel does not argue that the Service erred in charging him with being an inadmissible arriving alien, rather than a deportable admitted alien. *Compare* 8 U.S.C. § 1182 (defining classes of aliens who are ineligible to be admitted to the United States), *with id.* § 1227 (defining classes of aliens who are deportable after admission) *and id.* § 1101(a)(13)(C) (stating that "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States" unless the alien falls within one of six enumerated categories). Therefore, we do not address this issue.

[5] The IJ concluded that neither Zumel's attendance at the swearing-in ceremony for Marcos's running mate at the Manila Hotel nor his conduct during the coup attempt in 1987 constituted "engag[ing] in a terrorist

Zumel had "engaged" in the 1989 coup attempt by participating in its general planning. *See* 8 U.S.C. §§ 1182(a)(3)(B)(i)(I), (iv)(II). She also found that the 1989 coup attempt was unlawful under the laws of the Philippines, *see id.* § 1182(a)(3)(B)(iii), and that weapons were used during the coup attempt. She then addressed whether the coup attempt was undertaken with the requisite "intent to endanger." *See id.* § 1182(a)(3)(B)(iii)(V)(b). In her preliminary ruling, she found that it was undisputed that there were some deaths as a result of the coup attempt, which raised the inference that the participants intended to endanger individuals. In her final ruling, the IJ found Zumel to be credible and therefore credited his testimony that there were ALTAS officers stationed at Villamor AFB and Sangley AFB. The IJ held that this raised the inference that ALTAS intended to take over the bases using the leadership already in place, thereby avoiding bloodshed. Based on Zumel's testimony, the IJ also found that the ALTAS troops detained the commander at Sangley AFB, but did not injure or threaten him. The IJ stated that this fact raised the inference that the participants in the coup were promoting a peaceful surrender. Finally, the IJ found that the Aquino government, not the opposition, destroyed fighter planes in the coup attempt. Based on these findings and inferences, the IJ concluded that the government had not met its burden of proving that the participants in the 1989 coup attempt intended to endanger individuals or cause substantial property damage, and therefore ruled that Zumel was not inadmissible as an alien who engaged in terrorist activities. *See id.* § 1182(a)(3)(B)(i)(I).

---

activity," 8 U.S.C. § 1182(a)(3)(B)(i)(I). These determinations are not before us on appeal.

The BIA sustained the government's appeal. In response to the argument that Zumel's efforts to return power to a duly elected president made him a political combatant, not a terrorist, the BIA first stated it lacked jurisdiction to consider a group or individual's motive for engaging in an activity that otherwise meets the definition of "terrorist activity," citing *In re S-K-*, 23 I. & N. Dec. 936, 941 (BIA 2006). The BIA then concluded that Zumel "engaged" in the 1989 coup attempt both by helping plan the attempt and by soliciting others to join ALTAS and to participate in the coup attempt. In considering whether the 1989 coup attempt was a "terrorist activity," the BIA adopted the IJ's conclusions that the 1989 coup attempt was unlawful under Philippine law[6] and the attempt involved the use of firearms or other weapons. Turning to the intent of the coup participants, the BIA reached a different conclusion than the IJ. Based on the record, the BIA stated that the purpose of the members of ALTAS and other participants in the attempted coup was to force the government from power. Further, according to the BIA, the means for obtaining that purpose included a range of activities, including using weapons to secure an Air Force base, and thus it was undisputed that the participants anticipated that forcible action of some kind would be taken against the government. Based on these facts, the BIA concluded that the participants in the coup attempt intended to, and did, use weapons to endanger individuals. In reaching this conclusion, the BIA did not overturn the IJ's holding that Zumel was credible, instead noting that Zumel made

---

[6] Neither the BIA nor the IJ addressed the question whether the 1989 coup attempt "would be unlawful under the laws of the United States or any State," 8 U.S.C. § 1182(a)(3)(B)(iii), nor did the parties address the issue in their briefs. The issue is therefore not before us on appeal.

"significant concessions" in his testimony that supported the BIA's conclusion.

In light of its conclusions that Zumel "engaged" in the 1989 coup attempt and that the coup attempt constituted a "terrorist activity," the BIA determined that Zumel was inadmissible at the time he adjusted status to that of lawful permanent resident, and was therefore an arriving alien who was inadmissible as charged. The BIA ordered Zumel removed to the Philippines.[7] Zumel timely petitioned for review.

IV

Where, as here, "the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *See Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012) (internal quotation marks omitted). "We review agency factual findings and determinations of mixed questions of law and fact for substantial evidence," and legal questions de novo. *Khan*, 584 F.3d at 776. Whether the BIA applied the correct standard of review is a legal question. *Ridore v. Holder*, 696 F.3d 907, 911 (9th Cir. 2012). We defer to the BIA's

---

[7] After the BIA ordered Zumel removed, the parties agreed that the BIA lacked authority to order Zumel's removal in the first instance, *see Noriega-Lopez v. Ashcroft*, 335 F.3d 874 (9th Cir. 2003), and the case was remanded to the IJ solely for the entry of an order of removal. The IJ ordered Zumel removed for the reasons stated in the BIA's September 7, 2007 decision, and Zumel appealed. The BIA dismissed the appeal because the IJ's decision "was purely ministerial in nature" and Zumel did not raise any arguments not already addressed by the BIA in its September 7, 2007 decision.

non-precedential interpretation of ambiguous immigration statutes under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), meaning that our deference is proportional to the interpretation's "thoroughness, reasoning, consistency, and ability to persuade." *Lezama-Garcia v. Holder*, 666 F.3d 518, 524–25 (9th Cir. 2011) (quoting *Mejia–Hernandez v. Holder*, 633 F.3d 818, 822 (9th Cir. 2011)).

On appeal, Zumel does not dispute that the ALTAS members intended to overthrow the Aquino government. Nor does he dispute that the coup attempt involved the use of weapons. Instead he claims that the BIA erred in holding: (1) that he "engaged" in the coup attempt by planning it and soliciting others to participate in it, (2) that the coup attempt was unlawful under the laws of the place where it was committed, and (3) that it was undertaken "with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," *see* 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b).[8]

## A

We first consider Zumel's argument that, even if the 1989 coup attempt was a "terrorist activity," the record does not support the BIA's determination that he "engaged" in that activity by planning it and soliciting others to participate in it.

---

[8] The parties decline to raise any argument regarding the burden of proof. The BIA assumed without deciding that the government had the burden of proving that Zumel was not an "alien lawfully admitted for permanent residence," 8 U.S.C. § 1101(a)(13)(C), and on appeal, the government argues we need not reach this question of first impression. We agree, because we would reach the same conclusions regardless which party bears the burden of proof. Therefore, we will also assume without deciding that the government has the burden here.

We conclude that substantial evidence supports the BIA's determination that Zumel planned the 1989 coup attempt. *See id.* § 1182(a)(3)(B)(iv)(II). Zumel testified that prior to the 1989 coup attempt, he met with Honasan and they agreed to join forces to carry out a coup against the Aquino government; Zumel then held meetings with the relevant commanding officers to coordinate the attempt. Zumel also testified that he provided troops to support the takeover of Sangley AFB. Such evidence supports the BIA's determination that Zumel "at a minimum . . . helped in general planning of" the 1989 coup attempt. In light of this evidence, we are not persuaded "that any reasonable adjudicator would be compelled to conclude that the Government did not meet its burden" of proving that Zumel planned the attempt.[9] *Abufayad v. Holder*, 632 F.3d 623, 630 (9th Cir. 2011).

B

We next address Zumel's argument that the BIA erred by concluding that the 1989 coup attempt was unlawful under Philippine law. Zumel argues that his activity cannot be considered "unlawful under the laws of the [Philippines]" within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii) because the Philippine government did not formally declare his actions to be unlawful and no Philippine court formally determined that Zumel engaged in an unlawful act, and the

---

[9] Because we conclude that substantial evidence supports the BIA's determination that Zumel "engaged" in the 1989 coup attempt by planning it, we need not address the BIA's additional conclusion that Zumel also "engaged" in the attempt by soliciting others to participate in it.

Philippine government's grant of amnesty eliminated the existence of Zumel's unlawful activity under Philippine law.[10]

   Given the plain language of § 1182(a)(3)(B)(iii), we reject both arguments.  The text of § 1182(a)(3)(B)(iii) defines "terrorist activity" to mean "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)." It does not require the IJ to determine whether the government of the affected country formally declared the activity unlawful; indeed, the IJ need not even consider the laws of the affected country if the activity would be unlawful in the United States.[11]   Nor does the IJ have to determine whether the alien was convicted of the unlawful activity; the language of § 1182(a)(3)(B)(iii) focuses on the unlawful nature of an activity, not on whether the alien who engaged in the activity was convicted of a criminal offense.  When Congress wants to make clear that immigration consequences do not attach unless an alien is convicted of an offense, it uses express language to that effect.  *See, e.g.*, 8 U.S.C.

---

[10] Zumel does not dispute the IJ's conclusion that the 1989 coup attempt was unlawful under Philippine law at the time it was committed.  Nor could he, because this conclusion is well supported in the record.  Zumel testified that the Philippine government charged him with the crime of rebellion for the 1989 coup attempt, and a retired Associate Justice of the Court of Appeals in the Philippines stated under oath that Zumel's acts "were considered illegal and punishable" under Philippine law. Additionally, the certificate of amnesty given to Zumel states that he was granted amnesty "for acts constituting Rebellion / Coup d'etat committed during the period from February 26, 1986 to April 30, 1994."

[11] In any event, we note that the government of the Philippines formally declared in the Certificate of Amnesty that Zumel had engaged in "acts constituting Rebellion / Coup d'etat."

§ 1182(a)(2)(B) (stating that an alien "convicted of 2 or more offenses . . . for which the aggregate sentences to confinement were 5 years or more is inadmissible."). Because Congress omitted any reference to convictions in § 1182(a)(3)(B)(iii), we may presume this omission is intentional. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

For similar reasons, we reject Zumel's argument that the Philippine government's grant of amnesty eliminated the unlawfulness of Zumel's offense for purposes of § 1182(a)(3)(B)(iii). Again, nothing in § 1182(a)(3)(B)(iii) suggests that a grant of amnesty eliminates the unlawfulness of an activity. *Id.* The relevant inquiry under § 1182(a)(3)(B)(iii) is whether the *activity* is unlawful, not whether the person who engaged in the unlawful activity now stands before the law as though he had not committed a crime, or has been immunized from any legal consequences for the offense. *Cf. Marino v. INS*, 537 F.2d 686, 691 (2d Cir. 1976) (concluding that Italy's grant of amnesty to the petitioner did not "obliterate [the petitioner's] conviction for the purpose of determining eligibility to receive a visa and meet the eligibility requirement for adjustment of status" under U.S. immigration law). In other contexts, Congress has expressly provided that an alien who has been pardoned for unlawful conduct is relieved of immigration consequences. *See* 8 U.S.C. § 1227(a)(2)(A)(vi) (stating that certain grounds of deportability "shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States"). Since Congress knows how to eliminate the immigration consequences of unlawful conduct when it wants to, we should not interpret

congressional silence as accomplishing the same end. *Cf. Aguilera-Montero v. Mukasey*, 548 F.3d 1248, 1251–52 (9th Cir. 2008) (holding that an alien who receives a state pardon cannot waive immigration consequences of his conviction where the relevant statute lacks an express waiver provision). The BIA in this case likewise concluded that the amnesty Zumel received merely relieves him of the legal consequences of his actions, but it does not establish that the underlying activity was not "unlawful" for purposes of 8 U.S.C. § 1182(a)(3)(iii). This reasoning is entitled to *Skidmore* deference. *See Lezama-Garcia*, 666 F.3d at 524–25. We therefore reject Zumel's argument that because of the grant of amnesty, the 1989 attempted coup did not constitute an unlawful activity.[12]

C

Finally, we address Zumel's argument that the BIA erred by concluding that the 1989 coup attempt involved the use of firearms or other weapons "with intent to endanger, directly or indirectly, the safety of one or more individuals." *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(V).

---

[12] We also reject Zumel's argument that the BIA erred by equating amnesty with a pardon, as evidenced by its statement that Zumel received a "full pardon or amnesty." We need not determine whether there is a material distinction between amnesty and a pardon because there is no indication that the BIA misunderstood the nature of relief granted to Zumel. Rather, the BIA adopted the IJ's opinion, which included the finding that under Philippine law, amnesty "abolishes and puts into oblivion the offense itself" such that the person "stands before the law precisely as though he had committed no offense."

1

We first briefly address Zumel's argument that the BIA erred by stating that it lacks jurisdiction under *In re S-K-* to consider an organization or individual's motive in engaging in an activity. Zumel interprets this statement to mean that the BIA thought it lacked authority to consider Zumel's intent in participating in the 1989 coup attempt and argues that such a conclusion is contrary to § 1182(a)(3)(B)(iii)(V)(b), which defines terrorist activity as including the use of a weapon "*with intent* to endanger" others, *id.* (emphasis added).

This argument is based on a misunderstanding of *In re S-K-*, which considered whether an alien was statutorily ineligible for asylum and withholding of removal under § 1182(a)(3)(B)(iv)(VI) due to providing material support to a terrorist organization. 23 I. & N. Dec. at 937–38. In that case, the BIA held that it lacked authority to consider the argument that a rebel group is not a terrorist organization if it is fighting against an illegitimate or oppressive government. *Id.* at 941–42. Rather, *In re S-K-* concluded that Congress drafted § 1182(a)(3)(B) "very broadly, to include even those people described as 'freedom fighters,'" and did not give the BIA "discretion to create exceptions for members of organizations to which [the United States] Government might be sympathetic." *Id.* at 941. We upheld this interpretation in *Khan*, where we determined that § 1182(a)(3)(b) contains no exception "for armed resistance against military targets that is permitted under the international law of armed conflict." 584 F.3d at 784. We acknowledged that this interpretation of the statute would include such actions as "armed resistance by Jews against the government of Nazi Germany," but

determined that such an interpretation is required by the statute.[13] *Id.* at 781.

Here, the BIA did not err in citing to *In re S-K-* for the proposition that it lacks authority "to consider the motive of a group or individual that otherwise meets the terrorism definition." This portion of the BIA's opinion merely responded to Zumel's argument that ALTAS was not engaged in terrorist activities because the Aquino government was illegitimate. The BIA did not determine that it lacked jurisdiction to consider whether Zumel and ALTAS intended to endanger others in participating in the 1989 coup attempt; indeed, it expressly considered that issue. Rather, the BIA correctly noted that it lacked authority to consider the legitimacy of the Aquino government and ALTAS's motives in attempting to overthrow it. *See id.* at 784.

2

We now consider Zumel's argument that the BIA erred in determining that the 1989 coup participants used weapons "with intent to endanger, directly or indirectly, the safety of one or more individuals," § 1182(a)(3)(B)(iii)(V)(b). Zumel argues that the coup participants' intent is a question of fact, and the BIA improperly conducted its own factfinding when

---

[13] *Khan* also held that although the statute is broad, it is not unconstitutionally vague because it "elaborates in great detail what constitutes 'terrorist activity.'" *See* 584 F.3d at 785–86. This holding forecloses Zumel's argument that 8 U.S.C. § 1182(a)(3)(B)(i)(I) is overbroad and vague.

it determined that the coup participants had the requisite intent.**¹⁴**  *See* 8 C.F.R. § 1003.1(d)(3).**¹⁵**

---

**¹⁴** Zumel did not raise this argument in his opening brief, but we may consider it because the government had an opportunity to address it both at oral argument and in a supplemental letter to the court after oral argument.  *See Alcaraz v. INS*, 384 F.3d 1150, 1161–62 (9th Cir. 2004).

**¹⁵** 8 C.F.R. § 1003.1(d)(3) provides:

(3) Scope of review.

(i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

(ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

(iii) The Board may review all questions arising in appeals from decisions issued by Service officers de novo.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals. A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to the Service.

No precedential BIA opinion has determined whether the question of intent under § 1182(a)(3)(B)(iii)(V)(b) is a factual question, a legal question, or a mixed question of law and fact. On appeal, the government did not address this issue, but argued only that the BIA properly reviewed the IJ's factual findings regarding the coup participants' intent for clear error. *See id.* For purposes of this appeal, we assume that intent under § 1182(a)(3)(B)(iii)(V)(b) is a factual question.

Although the BIA regulations permit the BIA to "review questions of law, discretion, and judgment" de novo, 8 C.F.R. § 1003.1(d)(3)(ii), they preclude it from reviewing an IJ's factual findings de novo, *id.* § 1003.1(d)(3)(i). Instead, the BIA may review an IJ's factual findings only to determine whether the findings are clearly erroneous. *Id.* Under the regulations, the BIA may not make its own findings or rely "on its own interpretation of the facts." *Vitug v. Holder*, 723 F.3d 1056, 1063 (9th Cir. 2013) (internal quotation marks omitted). If the IJ has left certain factual disputes unresolved and the BIA believes that it cannot decide the case unless they are resolved, it cannot make its own factual findings but instead "must remand to the IJ for further factual findings." *Rodriguez*, 683 F.3d at 1173; *see also* 8 C.F.R. § 1003.1(d)(3)(iv).

The BIA may determine that an IJ's factual findings are clearly erroneous if the findings are "'illogical or implausible,' or without 'support in inferences that may be drawn from the facts in the record.'" *Rodriguez*, 683 F.3d at 1170–71 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 577 (1985)). When credibility determinations are at issue, the BIA may also determine an IJ's factual findings are clearly erroneous if a witness's testimony is contradicted by

documents or objective evidence, or is "'so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Id.* at 1171–72 (quoting *Anderson*, 470 U.S. at 575). But "[u]nder clear error review, if the BIA rejects a finding of the IJ, a 'conclusory pronouncement' that the IJ has erred is insufficient; 'the BIA [is] obligated to explain why the IJ clearly erred in so finding.'" *Vitug*, 723 F.3d at 1063 (alteration in original) (quoting *Ridore*, 696 F.3d at 917).

If the BIA reviews the IJ's factual findings de novo instead of for clear error, or makes its own factual findings, "it has committed an error of law." *Ridore*, 696 F.3d at 911 (internal quotation marks omitted). If the BIA's error "materially affected its decision[] to reverse the IJ," we must vacate the BIA's decision, *Brezilien v. Holder*, 569 F.3d 403, 414 (9th Cir. 2009), and remand for the BIA either to apply the correct clear error standard of review or to remand to the IJ to make any necessary additional factual findings. *Rodriguez*, 683 F.3d at 1177.

Assuming that intent under § 1182(a)(3)(B)(iii)(V)(b) is a factual question, the BIA here erred in failing to apply the clear error standard of review to the IJ's resolution of the intent issue. We base this conclusion on a number of factors. First, although the BIA references the clear error standard of review in its discussion of the IJ's credibility finding, it does not mention that standard in its discussion of the coup participants' intent. Although not dispositive, the BIA's failure to state it was reviewing the IJ's intent finding for clear error undermines the government's argument that the BIA actually applied that standard. *Compare Ridore*, 696 F.3d at 914, 919 (noting that "the BIA's decision nowhere mentions a standard of review" and ultimately

concluding that the BIA improperly engaged in de novo review of the IJ's factual findings), *with Perez-Palafox v. Holder*, 744 F.3d 1138, 1145–46 (9th Cir. 2014) (distinguishing *Ridore* in part because the BIA "recognized and acknowledged that the IJ's factual findings were to be reviewed for clear error").

Second, the BIA did not address whether the IJ clearly erred in making the key factual findings on which she based her conclusion regarding the coup participants' intent. For instance, the BIA did not address the IJ's finding that there were ALTAS officers stationed at Villamor AFB and Sangley AFB such that the bases could be taken over using the leadership already in place there, nor did it address her finding that ALTAS troops detained the commander at Sangley AFB, but did not injure or threaten him. Indeed, the BIA failed to even acknowledge that the IJ made a contrary finding regarding the coup participants' intent. The BIA's failure to evaluate the "factual findings of the IJ that were key to the IJ's holding," indicates the BIA was not reviewing the IJ's determination for clear error. *See Vitug*, 723 F.3d at 1064.

Finally, rather than explaining why the IJ's determination that the coup participants lacked the requisite intent was "illogical or implausible, or without support in inferences that may be drawn from the facts in the record," *Rodriguez*, 683 F.3d at 1170 (internal quotation marks omitted), the BIA merely stated that "[i]t is clear from the record that participants in [the 1989] coup intended to, and did, use weapons to endanger others," and that such weapons were vital to securing the Air Force bases and to other stages of the coup. Under our case law, such conclusory statements are

inadequate when the BIA is applying the clear error standard. *See Ridore*, 696 F.3d at 917.

Because the BIA did not acknowledge the proper standard of review, ignored facts found by the IJ, and did not explain why the IJ erred in finding that the coup participants lacked the requisite intent, we conclude that the BIA did not apply the clear error standard of review to the IJ's factual finding regarding the coup participants' intent. *See Vitug*, 723 F.3d at 1063–64; *see also Ridore*, 696 F.3d at 919. The BIA therefore engaged in a prohibited de novo review of material facts. *See Rodriguez*, 683 F.3d at 1177.

Accordingly, we grant Zumel's petition, vacate the BIA's decision, and remand for the BIA to consider the IJ's factual findings regarding intent under the correct clear error standard of review. *See Ridore*, 696 F.3d at 922 (granting the petition and remanding to the BIA to reconsider the IJ's decision applying the clear error standard of review); *Rodriguez*, 683 F.3d at 1177 (same).

**PETITION GRANTED.**